Filed 5/14/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GERAWAN FARMING, INC., | F068526 |
| Petitioner, | (39 ALRB No. 17) |
| v. | |
| AGRICULTURAL LABOR RELATIONS BOARD, | |
| Respondent; | |
| UNITED FARM WORKERS OF AMERICA, | |
| Real Party in Interest. | |
| GERAWAN FARMING, INC., | F068676 |
| Plaintiff and Appellant, | (Super. Ct. No. 13CECG01408) |
| v. | |
| AGRICULTURAL LABOR RELATIONS BOARD, | **OPINION** |
| Defendant and Respondent; | |
| UNITED FARM WORKERS OF AMERICA, | |
| Real Party in Interest and Respondent. | |

ORIGINAL PROCEEDING; petition for writ of review.  APPEAL from a judgment of the Superior Court of Fresno County.  Donald S. Black, Judge.

Irell & Manella, David A. Schwarz; Georgeson, Belardinelli and Noyes, C. Russell Georgeson; Barsamian & Moody and Ronald H. Barsamian for Petitioner, Plaintiff and Appellant.

NFIB Small Business Legal Center, Luke A. Wake; Benbrook Law Group, Bradley A. Benbrook, Stephen M. Duvernay; Walter & Wilhelm Law Group, Paul J. Bauer; McCormick, Barstow, Sheppard, Wayte & Carruth, Anthony Raimondo; California Farm Federation, Carl G. Borden; Ventura County Agricultural Association, Robert P. Roy; Center for Constitutional Jurisprudence, John C. Eastman, Anthony T. Caso; Western Growers Association and Jason E. Resnick for Amici Curiae on behalf of Petitioner, Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Mark R. Beckington and Benjamin M. Glickman, Deputy Attorneys General, for Defendant and Respondent.

Mario Martinez, Edgar Aguilasocho; Altshuler Berzon, Scott A. Kronland and Jonathan Weissglass for Real Party in Interest and Respondent.

-ooOoo-

Agricultural employer Gerawan Farming, Inc. (Gerawan) and United Farm Workers of America (UFW) have never reached mutually acceptable terms to enter a collective bargaining agreement (CBA) regarding Gerawan's agricultural employees. UFW was certified as the employees' bargaining representative in 1992, but after engaging in initial discussions with Gerawan, disappeared from the scene for nearly two decades. In late 2012, UFW returned and both parties renewed negotiations. A few months later, at UFW's request, the Agricultural Labor Relations Board (the Board) ordered the parties to a statutory "Mandatory Mediation and Conciliation" (MMC) process pursuant to Labor Code section 1164 et seq.[1] Under the MMC process, if a 30-day mediation period does not succeed in producing a CBA by voluntary agreement, the mediator decides what the terms of the CBA should be and reports that determination to the Board. Once the mediator's report becomes the final order of the Board, the report

---

[1] Unless otherwise indicated, all further statutory references are to the Labor Code.

2.

establishes the terms of an imposed CBA to which the parties are bound. (See §§ 1164, 1164.3.) Here, following the Board's final order adopting the mediator's report, Gerawan petitioned this court for review under section 1164.5, challenging the validity of the order and the MMC process on both statutory and constitutional grounds.[2] Among Gerawan's claims is the contention that UFW's lengthy absence resulted in an abandonment of its status as the employee's bargaining representative.

We agree with Gerawan's statutory argument that it should have been given an opportunity to prove abandonment to the Board once UFW requested the MMC process. More fundamentally, we agree with Gerawan's constitutional arguments that the MMC statute violates equal protection principles and constitutes an improper delegation of legislative authority. Accordingly, the Board's order, *Gerawan Farming, Inc.* (2013) 39 ALRB No. 17, is set aside.

## FACTS AND PROCEDURAL HISTORY

*Gerawan Farming*

Gerawan is a family owned farming business that has been in operation since 1938. Gerawan grows, harvests and packs stone fruit and table grapes on about 12,000 acres of farmland located in Fresno and Madera Counties, employing several thousand direct-hire workers and farm labor contractor employees.[3]

As was the case in the proceedings below, Gerawan's petition for review presents a description of its operations and business model, presumably because of its concern that

---

[2] Gerawan makes many of the same arguments in its related appeal, *Gerawan Farming, Inc. v. ALRB*, case No. F068676, which we have consolidated herewith for purposes of this opinion. The appeal in case No. F068676 is from the superior court's denial of a petition for writ of mandate by which Gerawan sought to set aside the Board's order directing the parties to the MMC process. We discuss case No. F068676 herein following our discussion of the issues raised in the petition for review (i.e., case No. F068526).

[3] In a brief filed with the Board, Gerawan estimated that in 2012 it employed approximately 5,100 direct-hire workers, plus an additional 6,300 farm labor contractor employees.

3.

such practices would be impeded by the CBA established under the MMC process. We summarize that description here, not to agree or disagree, but simply to accurately portray Gerawan's stated perspective. According to Gerawan, since the 1980's it has placed a major emphasis on quality control and on keeping well-trained, productive employees. To ensure the quality of its produce, it has developed unique interactive methods to maintain quality control at each step of the harvesting and packing process, including an ability to respond to problems in any individual worker's performance in real time. Allegedly, throughout the process, individual workers are notified of any problems, are given additional training or instruction and, if necessary, receive corrective action. Additionally, Gerawan asserts that to retain good workers it has consistently paid its direct-hire employees substantially more than the average industry wage, with many being compensated on a sliding-scale system (within a targeted per hour range) based on quality and productivity. In Gerawan's view, these operational features have been and still are central to its ongoing success, but would be hampered or prevented by the imposed CBA.[4]

*UFW's Certification in 1992*

On July 8, 1992, following a runoff election in 1990, UFW was certified as the exclusive bargaining representative for Gerawan's agricultural employees. On July 21, 1992, UFW sent a letter to Gerawan requesting negotiations. On August 13, 1992, Gerawan accepted UFW's request to begin bargaining and invited UFW to submit any proposals it wished to make. UFW did not send a proposal to Gerawan until

---

[4]     The mediator's report to the Board stated that Gerawan's position (i.e., that UFW's proposals would result in lower quality or productivity by interfering with Gerawan's business model) was not adequately substantiated: "The Company predicts, without any evidentiary support, that there will be a cost in terms of lower productivity, morale, retention, and competitiveness if many of the Union's proposals are implemented, because this business model will be disrupted."

4.

November 22, 1994. In February 1995, the parties held one introductory negotiating session.[5] After that, UFW did not contact Gerawan again until late 2012.

*UFW's Reappearance in 2012 and the Renewal of Bargaining*

On October 12, 2012, UFW sent a letter reasserting its status as the certified bargaining representative for Gerawan's agricultural employees and demanded that Gerawan engage in negotiations. Gerawan responded by letter dated November 2, 2012, expressing its willingness to bargain in good faith, but also raising a number of questions and concerns based on UFW's lengthy absence from the scene. An explanation of UFW's absence was requested, but UFW refused. Nonetheless, the parties proceeded with negotiations. Between January 17, 2013 and March 29, 2013, the parties held 10 or more bargaining sessions.

*MMC Process Ordered by the Board*

On March 29, 2013, UFW filed a declaration with the Board requesting that the Board issue an order referring the parties to the MMC process pursuant to section 1164 et seq. Gerawan filed an answer objecting to UFW's request on the grounds that the requirements of sections 1164 and 1164.11 were not satisfied and UFW had abandoned its status as the employees' bargaining representative. On April 16, 2013, the Board rejected Gerawan's arguments and ordered the parties to begin the MMC process.

Gerawan filed a petition for a writ of mandate in the superior court, asking the court to set aside the Board's order sending the parties to the MMC process. The superior court denied the petition.[6]

---

[5] According to Gerawan's negotiator, the February 1995 session focused on introductions and on deficiencies in UFW's proposal. The session ended with an understanding UFW would make a revised proposal and would contact Gerawan about future negations. Neither of these things happened.

[6] Gerawan appealed from the superior court's denial of its petition for writ of mandate. As noted, we have consolidated that separate appeal herewith.

A mediator was impaneled in May 2013 and conducted several mediation sessions with the parties. After the voluntary mediation phase of the MMC process was exhausted without any agreement being reached on the terms of a CBA, the mediator conducted *on the record* hearings in which he received testimony and evidence and made rulings on objections.[7] Thereafter, the mediator alone crafted the subject CBA. On September 28, 2013, the mediator submitted his report (i.e., his determination of the CBA's terms) to the Board.

*The Board Adopts the Mediator's Report*

Gerawan filed a petition with the Board objecting to the mediator's report, both generally and as to its particular terms. The Board granted review and remanded the matter back to the mediator as to six issues. After further meetings were held with the parties, the mediator issued a second report to the Board dated November 6, 2013. On November 19, 2013, the Board adopted the mediator's second report and it became the final order of the Board as set forth in *Gerawan Farming, Inc.*, *supra*, 39 ALRB No. 17, the legal effect of which was to establish the mediator's proposed CBA (as reported) as the final order of the Board. (See § 1164.3.)

*The Prior Decertification Election*

Two weeks beforehand, on November 5, 2013, with the Board's authorization, Gerawan's employees held an election to decide whether to decertify UFW as their bargaining representative. The ballots were impounded by the Board and have not yet been counted, pending the Board's resolution of claims of misconduct relating to the election. Shortly after the employees' votes were cast, Gerawan requested that the Board stay the MMC proceedings until the outcome of the election was known. The Board

---

[7] The mediator excluded Gerawan's employees from attending the *on the record* portion of the MMC proceedings. The Board ruled that such exclusion was proper. Gerawan filed a declaratory relief action in superior court, challenging the exclusion on constitutional grounds. That matter is not part of the present appeal.

6.

denied the stay request on November 14, 2013, without explanation.[8]  Thus, it is undisputed that when the Board adopted the mediator's report on November 19, 2013, and thereby approved the CBA as determined by the mediator, it did so despite the intervening decertification election, which may have ousted UFW.

*Gerawan's Petition for Review*

On December 16, 2013, Gerawan filed a petition for review (or more specifically, a petition for a writ of review) to this court, seeking our review under section 1164.5 of the Board's final order in *Gerawan Farming, Inc.*, *supra*, 39 ALRB No. 17.  In its petition, Gerawan contends that the Board's order was invalid on various statutory and constitutional grounds.  The statutory grounds focus on Gerawan's claims that the criteria for ordering the parties to the MMC process were not satisfied, including because UFW allegedly abandoned its status as the employee's bargaining representative.  In its constitutional arguments, Gerawan asserts the MMC process violates guarantees of equal protection and due process, and also constitutes an improper delegation of legislative powers.  Furthermore, Gerawan maintains that the right to freedom of contract prevents the State from imposing a CBA by administrative fiat.

Upon our consideration of the petition, the parties' briefing, and the Board's certified record, we issued a writ of review and formally notified the parties of our review of *Gerawan Farming, Inc.*, *supra*, 39 ALRB No. 17, pursuant to section 1164.5.

---

[8]    On November 13, 2013, senior UFW officials made improper ex parte communications to senior Board counsel on matters that were before the Board in regard to Gerawan and UFW, including the decertification vote and UFW's desire to immediately enforce the mediator's CBA. The ex parte communications were disclosed by the Board to all parties herein by letter dated November 19, 2013.  In light of the ex parte communications, Gerawan asked the Board to vacate its final order. We have not been made aware of the Board's response (if any) to that request.  Gerawan does not raise the ex parte communications or the Board's handling of same as issues herein.

7.

## DISCUSSION

In addressing the contentions raised in Gerawan's petition for review (case No. F068526), our approach will be to discuss the statutory issues first and the constitutional questions second. Lastly, we will briefly address the separate appeal filed by Gerawan (case No. F068676), which has been consolidated herewith.

### THE STATUTORY ISSUES

Inasmuch as we will conclude that the MMC statute unconstitutionally deprives Gerawan of equal protection and unconstitutionally delegates legislative authority, we could confine our opinion to a discussion of those issues alone. However, the parties have extensively briefed other issues relating to statutory interpretation and application of the MMC statute. We are not the highest court of review and hence do not presume to have the last word on this subject. We deem it appropriate to address the following statutory issues should they become relevant following a higher court ruling or a future attempt by the Legislature to enact another version of the MMC statute. Additionally, we reach the statutory issues as an alternative basis for our ruling; that is, even if the MMC statute were constitutionally sound, we would still conclude under the *statutory* arguments that the Board abused its discretion. For the sake of efficiency, we place our discussion of the statutory issues first because doing so will provide a thorough overview of the MMC statute (i.e., how it works and its purpose), which will give helpful background to our consideration of the constitutional issues.

### I.      Overview of the Statutory Framework

The Labor Code provisions creating the MMC process (§§ 1164–1164.13; the MMC statute) were added in 2002 as a new chapter (ch. 6.5) to the part of the code dealing with agricultural labor relations (div. 2, pt. 3.5), commonly known as the Agricultural Labor Relations Act (§ 1140 et seq.; the ALRA). (See Stats. 2002, ch. 1145, § 2.) Therefore, to understand how the MMC statute fits within its larger statutory framework, we begin with a brief description of the ALRA.

8.

A.    The ALRA

In 1975, the California Legislature enacted the ALRA "to provide for collective-bargaining rights for agricultural employees" (§ 1140.2) by putting into place a system of laws generally patterned after the National Labor Relations Act (29 U.S.C. § 151; the NLRA).  (*J.R. Norton Co. v. Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 8 (*J.R. Norton Co.*); see § 1148 [in implementing the ALRA, the Board follows applicable precedents of the NLRA].)  The ALRA declares it is the policy of the State of California "to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing … for the purpose of collective bargaining or other mutual aid or protection." (§ 1140.2.)[9]  As noted by our Supreme Court, "[a] central feature in the promotion of this policy is the [ALRA's] procedure for agricultural employees to elect representatives 'for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment, or other conditions of employment.'  (*Id.*, § 1156 et seq.)" (*J.R. Norton Co.*, *supra*, at p. 8.)  Under that election procedure, if a proper petition has been filed, the Board directs that an election be held by a secret ballot vote of employees to determine an issue of employee representation, such as whether a particular labor organization shall be the employees' bargaining representative.[10]  (§§ 1156, 1156.3.)  Except in certain runoff elections, every ballot "shall provide the employee with the opportunity to vote against representation by a labor organization by providing an appropriate space designated 'No Labor Organizations.'"  (§ 1156.3, subd. (c).)  After the election, the Board "shall certify" the result unless it determines based on a sustained election challenge "that there are

---

[9]    The same employees also have the right "to refrain from any or all of such activities …." (§ 1152.)

[10]    A similar procedure exists by which the agricultural employees may vote to decertify a labor organization, so that it is no longer their representative.  (§ 1156.7.)

sufficient grounds to refuse to do so." (§1156.3, subd. (e)(2) [stating grounds for such refusal].)

If a labor organization (i.e., a union)[11] is certified as the winner of such an election and thus becomes the employees' bargaining representative, certain legal consequences follow. First, a statutory bar exists to holding another representation election for at least the initial one-year certification period. (§§ 1155.2, subd. (b), 1156.5, 1156.6.) Second, a duty to bargain is created, which is owed by the employer to the union and vice versa. (§§ 1152, 1153, subd. (e), 1154, subd. (c).) However, unlike the election bar, the duty to bargain does not expire with the initial one-year period. That is because a union's status as the employees' certified bargaining representative continues beyond the one-year period for purposes of extending the parties' duty to bargain. (*Montebello Rose Co. v. Agricultural Labor Relations Bd*. (1981) 119 Cal.App.3d 1, 24–26, 29 (*Montebello Rose*) [affirming ALRB's conclusion that a certified union continues to enjoy that status after the initial certification year expires, based in part on NLRB precedent that there is a presumption of continuing majority status]; *F&P Growers Assn. v. Agricultural Labor Relations Bd*. (1985) 168 Cal.App.3d 667, 672 (*F&P Growers*) [noting "'rebuttable presumption'" under ALRA that a union continues to have majority support after initial one-year period].)[12] Consequently, it has been held that once a union is certified as the bargaining representative of an employer's agricultural employees, the employer's duty to bargain with that union continues until the union is replaced or decertified through a subsequent election pursuant to sections 1156.3 or 1156.7. (*Montebello Rose*, *supra*, at pp. 23–24, 29 [approving statutory interpretation adopted by the Board in *Kaplan's Fruit*

---

[11] The terms "union" and "labor organization" are used synonymously herein.

[12] Although section 1155.2, subdivision (b), refers to an initial one-year period of certification (and allows for a one-year extension thereof), that time limitation has been held to relate only to the election bar, not to the duty-to-bargain aspect of certification. (*Montebello Rose*, *supra*, 119 Cal.App.3d at pp. 24–30.)

10.

*& Produce Co., Inc*. (1977) 3 ALRB No. 28 (*Kaplan's*)]; *Adamek & Dessert, Inc. v. Agricultural Labor Relations Bd*. (1986) 178 Cal.App.3d 970, 983 (*Adamek & Dessert, Inc.*); *Bruce Church, Inc*. (1991) 17 ALRB No. 1, p. 13 [stating principle adhered to by the Board that "a Union remains the certified representative until decertified"]; *Pictsweet Mushroom Farms* (2003) 29 ALRB No. 3, p. 7 [same].)[13]

In summary, the ALRA recognizes, protects and promotes agricultural employees' right to collective bargaining (§ 1140.2), and in the furtherance of that right the ALRA requires the agricultural employer and the employees' certified representative to bargain collectively in good faith (§§ 1153, subd. (e), 1154, subd. (c)). The ALRA defines the parties' mutual obligation to bargain collectively in good faith as follows: "[T]o bargain collectively in good faith is the performance of the mutual obligation of the agricultural employer and the representative of the agricultural employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any questions arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession." (§ 1155.2, subd. (a).)

When an employer or labor organization fails to bargain in good faith as required, or when other unfair labor practices (or ULP's) as defined in the ALRA have occurred, recourse to the Board is provided and the Board is empowered to issue orders or take remedial action to effectuate the purposes of the ALRA. (§§ 1160–1160.9; see, e.g., *Harry Carian Sales v. Agricultural Labor Relations Bd*. (1985) 39 Cal.3d 209, 229–230 [discussing Board's remedial authority relating to ULP's].)

---

[13] A third consequence of certification is that no CBA may be negotiated or entered into by the employer with any other (not currently certified) labor organization. (§ 1153, subd. (f).) The ALRA further declares that only a certified labor organization may be a party to a legally valid CBA. (§ 1159.)

11.

B.      The MMC Statute

In 2002, the Legislature made the following legislative declaration and findings: "[A] need exists for a mediation procedure in order to ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the [ALRA], ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural labor force, and promote California's economic well-being by ensuring stability in its most vital industry." (Stats. 2002, ch. 1145, § 1.) To that end, the Legislature enacted the MMC statute in 2002 (Stats. 2002, ch. 1145, § 2, as amended by Stats. 2002, ch. 1146, § 1), creating a binding interest arbitration procedure (what we have called the MMC process) that may be ordered by the Board as a means to establish the terms of an initial CBA where the parties failed to reach an agreement. (*Hess Collection Winery v. Agricultural Labor Relations Bd.* (2006) 140 Cal.App.4th 1584, 1591, 1597 (*Hess*).)[14] Proponents of the law asserted that such measures were necessary because, after unions were certified to represent agricultural employees, many employers "refused to agree to the terms of [CBA's]." (*Hess*, *supra*, at p. 1593.)

The heart of the MMC process is described in section 1164. Pursuant to subdivision (a) of that section, the employer or the certified labor organization may seek to initiate the MMC process by filing a declaration with the Board requesting such relief. The declaration must show that the statutory requirements for ordering the parties to the

---

[14]      As *Hess* noted, the MMC process (also called "interest arbitration") does not involve "interpreting an existing agreement to resolve a dispute," but "determining what the terms of a new agreement should be." (*Hess*, *supra*, 140 Cal.App.4th at p. 1597.) Thus, despite the law's use of the term "'mediator,'" the process "amounts to compulsory interest arbitration." And, although section 1164 refers to the end result being a "'collective bargaining agreement,'" there "is no agreement," since the employer in that case (as here) did not agree to be bound by its terms nor to submit the matter to interest arbitration. (*Hess*, *supra*, at p. 1597.) Rather, "[t]he terms of the 'agreement' determined by the arbitrator were imposed upon Hess by force of law." (*Ibid*.)

12.

MMC process have been met, and it may only be filed after the relevant time period specified in the statute has expired. (§ 1164, subd. (a); see Cal. Code Regs., tit. 8, § 20400.) In this regard, the precise wording of section 1164, subdivision (a), is in part as follows: "An agricultural employer or a labor organization certified as the exclusive bargaining agent of a bargaining unit of agricultural employees may file with the board, at any time following (1) 90 days after a renewed demand to bargain by an agricultural employer or labor organization certified prior to January 1, 2003, *which meets the conditions specified in Section 1164.11*, (2) 90 days after an initial request to bargain by an agricultural employer or labor organization certified after January 1, 2003, … a declaration that the parties have failed to reach a [CBA] and a request that the board issue an order directing the parties to mandatory mediation and conciliation of their issues." (Italics added.)

As the italicized language above states, section 1164.11 sets forth additional conditions that must be satisfied (as prerequisites to the MMC process) if the certification occurred prior to January 1, 2003. Section 1164.11 states: "A demand made pursuant to paragraph (1) of subdivision (a) of Section 1164 may be made only in cases which meet all of the following criteria: (a) the parties have failed to reach agreement for at least one year after the date on which the labor organization made its initial request to bargain, (b) the employer has committed an unfair labor practice, and (c) the parties have not previously had a binding contract between them."

When a declaration pursuant to subdivision (a) of section 1164 is filed with the Board and shows that the statutory requirements for ordering the MMC process are satisfied, the Board "shall immediately issue an order directing the parties to [MMC] of their issues,"[15] whereupon steps are taken to select a mediator. (§ 1164, subd. (b).)

---

[15] The Board also considers the *answer* (if any) filed by the other party to the collective bargaining relationship. Pursuant to California Code of Regulations, title 8, section 20401,

13.

Upon his or her appointment, the mediator promptly begins a 30-day mediation process seeking to resolve issues by voluntary agreement.[16] (§ 1164, subd. (c).) If that mediation process is deemed exhausted (i.e., no CBA is reached), then, "[w]ithin 21 days, the mediator shall file a report with the board that resolves all of the issues between the parties and establishes the final terms of a [CBA] …." (§ 1164, subd. (d).) The mediator's report to the Board must include "the basis for the mediator's determination" and "shall be supported by the record." (*Ibid.*)

In resolving disputed issues and deciding what the CBA's terms should be, the mediator "may consider those factors commonly considered in similar proceedings, including: (1) The stipulations of the parties. [¶] (2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer claims an inability to meet the union's wage and benefit demands. [¶] (3) The corresponding wages, benefits, and terms and conditions of employment in other [CBA's] covering similar agricultural operations with similar labor requirements. [¶] (4) The corresponding wages, benefits, and terms and conditions of employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed. [¶] (5) The average consumer prices for goods and services according to the California Consumer Price Index, and the overall cost of living, in the area where the work is performed." (§ 1164, subd. (e).)

Within seven days of the filing of the mediator's report, either party may petition the Board for review of the report. (§ 1164.3, subd. (a).) The grounds for such review

---

subdivision (a), the other party is permitted to file an answer to the declaration within three days of service of the declaration, identifying any statements in the declaration that are disputed.

[16] The mediator may extend the 30-day mediation period for an additional 30 days on agreement of the parties. (§ 1164, subd. (c).)

14.

are that a provision of the CBA set forth in the mediator's report is (1) unrelated to wages, hours, or other conditions of employment, (2) based on clearly erroneous findings of material fact, or (3) arbitrary or capricious in light of the mediator's findings of fact. (*Ibid.*) If a prima facie case for review is not shown, or if no petition is filed, the report becomes the final order of the Board. (§ 1164.3, subd. (b).) If the Board determines that a prima facie case for review is shown, it may grant review of the report. (*Ibid.*) If, upon review, the Board finds that one or more grounds for review have been established, it will order the mediator to modify the problematic terms of the CBA. (*Id.*, subd. (c).) In that case, the mediator meets with the parties again and files a second report with the Board. (*Ibid.*) As before, the parties may petition the Board for review of the second report. (*Id.*, subd. (d).) If no petition is filed, the second report takes effect as the final order of the Board. (*Ibid.*) If a petition is filed but a prima facie showing is not made, the Board "shall issue an order confirming the mediator's report and order it into immediate effect." (*Ibid.*) If the Board accepts review and finds that the second report is defective, it will determine the remaining issues itself and issue a final order. (*Ibid.*)[17]

Section 1164.5 provides for judicial review of the Board's final order. That section states: "Within 30 days after the order of the board takes effect, a party may petition for a writ of review in the court of appeal or the California Supreme Court." (*Id.*, subd. (a).) Appellate review is limited to the grounds specified in section 1164.5, but those grounds include, inter alia, a consideration of whether the Board acted in excess of its powers, whether it failed to proceed in the manner required by law, whether the Board's order or decision "was an abuse of discretion," and/or whether the Board's order

---

[17] The parties also have a right to file a petition to set aside the mediator's report on the ground that (1) the mediator's report was procured by corruption, fraud, or other undue means, (2) there was corruption in the mediator, or (3) the rights of the petitioning party were substantially prejudiced by the misconduct of the mediator. If any of these grounds are found to exist, the Board will vacate the report, order the selection of a new mediator, and the mediation process starts over. (§ 1164.3, subd. (e).)

15.

or decision "violate[d] any right of the petitioner under" the federal or state constitutions. (*Id.*, subd. (b)(1)–(4).)

## II.    Standard of Review and Rules of Statutory Construction

Having introduced the MMC statute, we next consider the nature of the statutory claims raised in Gerawan's petition. In a nutshell, Gerawan argues the Board did not follow the law when it ordered the parties to the MMC process because several of the statutory requirements for such an order (set forth in sections 1164 and 1164.11) allegedly were not met. According to Gerawan, the Board adopted erroneous interpretations of the statutory provisions at issue, causing it to incorrectly conclude that the statutory requirements were satisfied. Additionally, Gerawan asserts the Board improperly rejected its argument that UFW abandoned its status as the employees' bargaining representative and, therefore, lacked standing to invoke the MMC process under section 1164.

It is clear that Gerawan's claims involve questions of law relating to statutory construction. The rules governing statutory construction are well settled. "We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] To determine legislative intent, we turn first to the words of the statute, giving them their usual and ordinary meaning. [Citations.] When the language of a statute is clear, we need go no further." (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 (*Nolan*).) In that case, "no court need, or should, go beyond that pure expression of legislative intent. [Citation.]" (*Green v. State of California* (2007) 42 Cal.4th 254, 260.) "If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.)

However, when the language of the statute "is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy,

16.

contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (*Nolan*, *supra*, 33 Cal.4th at p. 340.) Using these extrinsic aids, we "'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*People v. Sinohui* (2002) 28 Cal.4th 205, 212.)

Where judicial interpretation is required, courts give deference to an agency's reasonable interpretation of the statutory enactment that the agency has been entrusted by law to enforce. (*Montebello Rose*, *supra*, 119 Cal.App.3d at p. 24.) Nevertheless, it is fundamental in statutory construction that courts should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*J.R. Norton Co.*, *supra*, 26 Cal.3d at p. 29.) Thus, while an administrative agency is entitled to deference when interpreting policy in its field of expertise, it cannot alter or amend the statute that it is interpreting, or enlarge or impair its scope. (*Ibid.*; *Adamek & Dessert, Inc.*, *supra*, 178 Cal.App.3d at p. 978.)

To the above, we add the following basic precepts regarding a court's role in the interpretation of statutes. As expressed in *Cadiz v. Agricultural Labor Relations Bd*. (1979) 92 Cal.App.3d 365, at page 372: "The guiding principle of interpretation was laid down by the Legislature in Code of Civil Procedure section 1858: 'In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.' That prime rule of construction has been adopted and restated by the cases." Furthermore, it is not a court's function to second-guess the policy choices or wisdom of particular legislation: "'Courts do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature.' [Citations.]" (*Ibid.*)

17.

**III.    Requirements of Section 1164.11**

Gerawan contends that two of the conditions for relief stated in section 1164.11 were not shown by UFW and, therefore, the Board should not have ordered the parties to the MMC process.  Under that section, where the union's certification occurred prior to January 1, 2003, no demand to the Board may be made for referral to the MMC process unless the following criteria are met:  "(a) the parties have failed to reach agreement for at least one year after the date on which the labor organization made its initial request to bargain, (b) the employer has committed an unfair labor practice, and (c) the parties have not previously had a binding contract between them."  (§ 1164.11; cf. § 1164, subd. (a)(1).)  Specifically, Gerawan argues that the requirements of criteria (a) and (b) of section 1164.11 (hereafter sections 1164.11(a) and 1164.11(b)) were not established based on Gerawan's proposed interpretations of those provisions.  As explained below, we reject Gerawan's arguments regarding the construction of the statutory language and conclude that the Board followed the clear and unequivocal terms of section 1164.11 when it held that the requirements thereof were met.

A.    <u>The Parties Failed to Reach Agreement for at Least One Year</u>

Section 1164.11(a) states a requirement for seeking the MMC process in cases involving pre-2003 certifications that "*the parties have failed to reach agreement for at least one year after the date on which the labor organization made its initial request to bargain.*" (Italics added.)  In the proceedings before the Board, Gerawan insisted this language meant there had to be "'a good faith and sustained effort'" at negotiation for at least a one-year period.  It further argued that since UFW did not make such a showing, the Board was constrained to deny UFW's request.  The Board disagreed.  It explained that section 1164.11(a) does not contain any language requiring proof of one year of sustained and active bargaining, but only that "the parties failed to reach an agreement for at least one year" after the initial request to bargain, which the Board found to be the case.

18.

In its opening brief herein, Gerawan argues the Board erred because the provision should be construed to specifically require a showing that the parties "actively attempt[ed] to bargain for at last one year," since "one cannot 'fail' to reach an agreement if one does not try." We reject Gerawan's proposed interpretation. The plain language of section 1164.11(a) simply requires that (1) the parties have not reached agreement and (2) at least one year has passed since the initial request to bargain. The provision makes no mention of the particular circumstances surrounding the parties' failure to agree. Contrary to Gerawan's suggestion, nothing in section 1164.11(a) mandates an affirmative showing of active and/or sustained bargaining over a one-year period. "When the language of a statute is clear, we need go no further." (*Nolan*, *supra*, 33 Cal.4th at p. 340.) Whether or not it would have been wise to include a threshold requirement that before a party may invoke the MMC process, the party must demonstrate there was one year of sustained bargaining, the Legislature did not do so in the particular provision under consideration here. One may argue it *should have*, but we are constrained by the fact that it did not. That ends the matter, since it is not our function to insert what the Legislature has omitted, nor may we, "under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used.' [Citation.]" (*People v. Leal* (2004) 33 Cal.4th 999, 1008.)

Although, as Gerawan points out, other provisions of the ALRA obligate the parties to bargain in good faith (e.g., §§ 1153, subd. (e), 1154, subd. (c), 1155.2, subd. (a)), those provisions do not alter the plain meaning of what must be shown under section 1164.11(a).[18] Even if, based on the general bargaining obligation, the parties should have engaged (or attempted to engage) in active and/or sustained bargaining

---

[18] Of course, if a labor union refuses to bargain in good faith, including a failure to respond to the employer within a reasonable time or other dilatory or evasive action, the employer can raise the union's failure in a ULP charge pursuant to section 1154, subdivision (c). (See *Dole Fresh Fruit Co*. (1996) 22 ALRB No. 4, pp. 22–25.) "[T]he duty to bargain is not unilateral, neither are the Board's processes." (*Id*., p. 23, fn. omitted.)

19.

during the one-year period specified in section 1164.11(a), the latter provision does not require that such conduct be affirmatively demonstrated as part of the necessary prima facie showing to request the MMC process.[19]

In this case, it is not disputed that UFW's initial request to bargain was made in 1992. Additionally, UFW followed up its request by making a contract proposal to Gerawan in 1994, and one bargaining session occurred between the parties in early 1995. Insofar as the parties have still not reached agreement, the discrete statutory requirement set forth in section 1164.11(a) was clearly satisfied.

Gerawan's Further Arguments Do Not Persuade Us
to Depart From the Plain Meaning of Section 1164.11(a)

Having upheld the plain meaning of section 1164.11(a), we briefly explain why we have not accepted Gerawan's arguments that we should depart from the statute's clear and literal terms.

In essence, Gerawan asserts that if the statute were treated as simply a passage-of-time requirement, it would lead to absurd results and contravene the overall legislative purposes of the ALRA and MMC statutes. To avoid that outcome, Gerawan argues that we should construe the provision to include an active or sustained bargaining requirement, even if that is not its plain meaning. (See, e.g., *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340 [stating rule that a court need not follow the plain meaning of a statute when to do so would frustrate the manifest purpose of the legislation as a whole or lead to absurd results]; *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [stating rule that plain meaning may be disregarded only when that meaning is repugnant to the general purview of the act or for some other compelling

---

**19**     Consistent with our conclusion as to the plain meaning of this provision, we observe that each of the conditions set forth in sections 1164 and 1164.11 appear to be matters that are ordinarily capable of being readily and quickly ascertained (rather than debatable factual matters that might have to be litigated), which comports with the Legislature's apparent wish to create an expedited process, at least in the usual or typical case.

reason].) In this regard, it is pointed out that the ALRA (of which the MMC statute is a part) has a purpose to promote good faith bargaining between the employer and the employees' chosen representative so they may potentially reach a mutually acceptable agreement, which purpose is supported by the duty to bargain collectively in good faith (see §§ 1140.2, 1155.2, subd. (a)). According to Gerawan, if the Board's interpretation[20] were correct, a union could make an initial request to bargain and then simply wait out the clock or engage in surface bargaining until enough time had passed to demand the MMC process (i.e., precisely what Gerawan contends happened here). Allegedly, a union in that situation would have no incentive to make voluntary concessions or otherwise engage in serious or genuine efforts to reach an agreement. In short, Gerawan maintains that the Board's interpretation would lead to absurd results at odds with the legislative purposes by (1) undermining a union's incentive to bargain in good faith and (2) potentially forcing employers to undergo the MMC process without a sustained period of good faith bargaining for an entire year.

While Gerawan's arguments identify significant concerns as to the potential impacts of section 1164.11(a), we believe they fall short of showing that we should effectively rewrite the statute by construing it to include a sustained or active bargaining requirement that the Legislature did not put there. (See *Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1698 [absurdity exception to plain meaning rule "should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government"].) Among other things, Gerawan's analysis of the statutory purposes fails to adequately account for the fact that the ALRA was amended by the MMC statute. The Legislature determined that the ALRA, in its original form, was not adequately fulfilling its purposes. (Stats. 2002, ch. 1145, § 1;

---

[20] That is, a literal reading of the statute according to its plain meaning, as we have adopted herein.

21.

*Hess*, *supra*, 140 Cal.App.4th at p. 1600.) New measures were deemed necessary because it was perceived that many employers were unwilling to enter into an initial CBA. (*Hess*, *supra*, at p. 1593.) Therefore, the MMC statute was enacted as an amendment to the ALRA to create a "one-time" compulsory process to bring about an initial CBA between parties who have never entered into such an agreement, where certain statutory conditions were met. (*Hess*, *supra*, at pp. 1600–1601 [noting the purpose "to change attitudes toward collective bargaining by compelling the parties to operate for at least one term" with an imposed CBA].) Among those statutory conditions is the one now before us—the passage of the one-year time period described in section 1164.11(a). In that provision, the Legislature specified that expiration of the one-year time period without a CBA (i.e., "the parties have failed to reach agreement for at least one year after" the union's initial request to bargain) was one of the threshold requirements for seeking a referral to the MMC process in cases involving pre-2003 certifications. Evidently, the Legislature believed that if more than one year elapsed without a CBA being reached, that fact reasonably indicated the MMC process was appropriate, assuming that the other requirements were also met. Viewed in light of the entire statutory context, we are unable to conclude that the one-year provision of section 1164.11(a), when accorded its plain and literal meaning, would substantially frustrate the main purpose of the ALRA *as amended by the MMC statute*, or otherwise lead to absurd results.

In a further effort to support its position on this issue, Gerawan notes that the Board's own past decisions had, on at least two occasions, expressed an understanding of the relevant statutory provisions that sounded remarkably similar to Gerawan's position. (See *Pictsweet Mushroom Farms*, *supra*, 29 ALRB No. 3, p. 12 [to be sent to MMC process, employer "must have been through a period of bargaining for a year without having reached a contract"]; *D'Arrigo Bros. Co*. (2007) 33 ALRB No. 1, p. 7 [MMC process may not be invoked unless parties have attempted to negotiate on their own for

22.

the statutory period].)[21]  However, it appears that such comments were made by the Board in connection with tangential issues, and that once the Board directly considered the present issue of statutory construction, it followed the plain meaning (see, e.g., *Gerawan Farming, Inc*. (2013) 39 ALRB No. 5, p. 3).  In any event, we are bound to do so here.[22]

Still, the Board's earlier comments about the import of the relevant statutory provisions provide some evidence that Gerawan's proposed construction is not mere wishful thinking on its part.  There is cogency and common sense in Gerawan's argument that active bargaining should precede the MMC process, and it is not unreasonable to suggest that the former should be a prerequisite to commencing the latter.  But such argument is more properly presented to the Legislature, whose exclusive function is to enact statutes such as those at issue here.  Moreover, if we were to adopt Gerawan's interpretation, what additional specific language would we incorporate into the statute: sustained bargaining, active bargaining, actual bargaining, attempted bargaining?  Would we likewise be expected to delineate how much or what quality of bargaining effort would constitute sustained, active, actual, or attempted bargaining?  And if there was no bargaining during the one-year period under any definition, would it matter why there was no bargaining, or whose fault, if any, it was for the parties' failure to reach an agreement?  These are some of the prickly questions that would be raised if this court, or any court, felt inclined to impose additional substantive requirements beyond those

---

**21**     Also, the Governor's written signing message indicated that the bill's (the MMC statute's) provisions would "'Appl[y] to first contracts only,'" and as to pre-2003 certifications, "'[t]he parties must have attempted to negotiate for one year ….'"  (Historical and Statutory Notes, 44A West's Ann. Lab. Code (2011 ed.) foll. § 1164, p. 401.)

**22**     We must ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*J.R. Norton Co.*, *supra*, 26 Cal.3d at p. 29.)  Although an administrative agency is entitled to deference when interpreting policy in its field of expertise, it cannot alter or amend the statute that it is interpreting, or enlarge or impair its scope.  (*Ibid.*; *Adamek & Dessert, Inc.*, *supra*, 178 Cal.App.3d at p. 978.)

23.

specified in the statute before the Board could refer a case to the MMC process. The nature of these quandaries reinforces our concern that, if we went down that path, we would be intruding into the legislative arena. We decline to do so. As was aptly stated by another Court of Appeal: "[E]xcept in the most extreme cases where legislative intent and the underlying purpose are at odds with the plain language of the statute, an appellate court should exercise judicial restraint, stay its hand, and refrain from rewriting a statute to find an intent not expressed by the Legislature." (*Unzueta v. Ocean View School Dist.*, *supra*, 6 Cal.App.4th at p. 1700.)

B.      The Employer Committed a ULP

Gerawan also challenges the Board's conclusion that section 1164.11(b) was satisfied in this case. Section 1164.11(b) states an additional requirement to invoking the MMC process in cases involving pre-2003 certifications that "*the employer has committed an unfair labor practice*." (Italics added.) The Board held that this requirement was met as a result of two 1992 cases in which Gerawan was found to have committed ULP's: "The cases identified by the UFW in its declaration, *Gerawan Ranches* (1992) 18 ALRB No. 5 and *Gerawan Ranches* (1992) 18 ALRB No. 16, which involved multiple ULP's committed in connection with the elections that resulted in the certification of the UFW, including a refusal to bargain over unilateral changes made in the post-election, pre-certification period, meet the requirement of … section 1164.11[(b)] that the employer 'committed an unfair labor practice.'"

Gerawan contends the Board erred because the two cases relied upon by the Board allegedly did not come within the scope of this provision. According to Gerawan, the cases did not qualify because the particular conduct constituting the ULP's (1) occurred prior to the date of UFW's certification and (2) did not involve a finding that Gerawan resisted CBA negotiations with UFW after that union was certified. We reject Gerawan's assertion that section 1164.11(b) is limited solely to postcertification conduct or to special types of ULP's in relation to the union. The actual language of the provision is

24.

clear and explicit, stating simply that "the employer has committed an unfair labor practice"; it contains no hint of the additional requirements or limitations urged by Gerawan. (§ 1164.11(b).) As with the requirement contained in section 1164.11(a), we follow the plain meaning with respect to section 1164.11(b). "If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs." (*Wells v. One2One Learning Foundation*, *supra*, 39 Cal.4th at p. 1190.) We conclude the Board correctly interpreted and applied this provision.

## IV. Requirements of Section 1164 and the Abandonment Issue

Pursuant to section 1164, a union must be "*certified as the exclusive bargaining agent of* [*the*]… *agricultural employees*" to have the right to petition the Board for an order directing the parties to commence the MMC process. (§ 1164, subd. (a), italics added.) In the proceedings below, Gerawan challenged UFW's standing as the employees' certified bargaining representative on the ground that such status was forfeited by abandonment based upon UFW's nearly two-decade absence. The Board summarily rejected the abandonment claim, relying on its prior holdings on that issue. (*Gerawan Farming*, *Inc.*, *supra*, 39 ALRB No. 5, pp. 3–4.)

As reflected in its prior holdings, the Board's position is that abandonment does not exist unless a union is either *unwilling* or *unable* to continue to represent the subject employees. (*Bruce Church, Inc.*, *supra*, 17 ALRB No. 1, p. 13.) Further, the Board has elaborated in its holdings that a union will only be found unwilling to represent the employees where it has expressly disclaimed or abdicated its status as the employees' bargaining representative, and a union will only be found unable to carry out its responsibilities if it has become defunct as an organization. According to the Board, aside from these narrowly defined grounds for abandonment, a union's status as the employee's certified bargaining representative continues unabated until that union is replaced or decertified by a subsequent election. (See, e.g., *San Joaquin Tomato Growers, Inc.* (2011) 37 ALRB No. 5, pp. 3–4; *Pictsweet Mushroom Farms*, *supra*, 29

25.

ALRB No. 3, pp. 7, 14; *Dole Fresh Fruit Co.*, *supra*, 22 ALRB No. 4, pp. 12–13; *Bruce Church, Inc.*, *supra*, p. 13.)[23]  Additionally, according to the Board's analysis, "what may appear to an employer to be abandonment may be overcome by the union's demonstration that it is in fact able and willing to continue to represent employees." (*Dole Fresh Fruit Co.*, *supra*, p. 12; see *Pictsweet Mushroom Farms*, *supra*, p. 14.) Since at the precise time that UFW sought to invoke the MMC process it was purportedly able and willing to resume its representation of Gerawan's employees, any past prolonged absence on the part of UFW would be, under the Board's view, irrelevant.

Gerawan contends the Board reversibly erred in disallowing the abandonment theory in the context of the MMC process.  Among other things, Gerawan points out that under well-established case law, after the initial one-year period there is a rebuttable presumption that a union continues to be supported by a majority of employees.  Since there is such a presumption, Gerawan asserts it is reasonable to consider whether there are circumstances (such as those present here) in which the presumption may be overcome.  Additionally, Gerawan points out that the forfeiture of rights by abandonment is a recognized legal principle that should be given application here as in other cases.  As to the employer's continuing duty to bargain, Gerawan does not dispute that such a duty exists, but notes the MMC process is qualitatively different than consensual bargaining as defined in the ALRA (see § 1155.2, subd. (a)) because, under the MMC process, voluntary negotiations quickly give way to a compulsory procedure that will mandate the imposition of a CBA by administrative edict.  For these and other reasons, Gerawan maintains that when a union files a request to the Board for an order to commence the MMC process, the employer may defensively challenge the union's presumed status as the "labor organization certified as the exclusive bargaining agent of [the] bargaining

---

**23**  Thus, the Board's position on abandonment is sometimes referred to by the parties as an application of the general principle that a union is *certified until decertified*.

unit" (§ 1164, subd. (a)) by showing that the union forfeited that status through abandonment.

After carefully considering the matter, we believe that Gerawan's position is largely correct. Without disturbing the well-settled rule that an employer's duty to bargain is a continuing one, we conclude that abandonment may be raised defensively in response to a union's demand to invoke the substantial legal measures of the MMC process. Allowing such a challenge would not add to the MMC statute's express provisions, but would simply permit the employer to *negate* a statutory element of section 1164—that is, the union's representative status, which is a qualification for MMC relief. We now proceed to explain our conclusion.

A.     Prior Judicial Construction of Statutory Terminology

A foundational step in our analysis of this difficult issue is to consider prior judicial construction of the statutory concept of a union's certification status. When the Legislature enacts a statute, it is presumed to have knowledge of the existing judicial decisions construing the statute or related statutes and to have enacted new statutes or amendments in light of those decisions. (*People v. Giordano* (2007) 42 Cal.4th 644, 659; *People v. Yartz* (2005) 37 Cal.4th 529, 538; *Scottsdale Ins. Co. v. State Farm Mutual Automobile Ins. Co.* (2005) 130 Cal.App.4th 890, 900.) Furthermore, where the language of a statute uses terms that have been judicially construed, courts generally presume that the Legislature intended the terms to have the same precise meaning as was placed on them by the courts. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046.) "When legislation has been judicially construed and a subsequent statute on a similar subject uses identical or substantially similar language, the usual presumption is that the Legislature intended the same construction, unless a contrary intent clearly appears." (*People v. Lopez* (2003) 31 Cal.4th 1051, 1060.)

Here, in light of the particular judicial decisions that have explained and fleshed out the meaning of a union's certification status under the ALRA, we do not operate on a

blank slate and neither did the Legislature when it enacted the MMC statute in 2002. To the contrary, such prior judicial construction of the ALRA clearly set the stage for the Legislature's usage of the certification terminology in section 1164, subdivision (a).

A key decision construing the meaning and implications of a union's certification status under the ALRA was *Montebello Rose*, *supra*, 119 Cal.App.3d 1. In that case, the issue to be determined on appeal was "whether an employer's duty to bargain with the certified employee representative continues beyond the initial certification year absent an extension of the certification period as provided in section 1155.2, subdivision (b) .…" (*Id*. at p. 6.)[24] The employer had argued that it could not have violated the duty to bargain in good faith with the union because the union's certification period had lapsed; that is, the one-year period of certification specified under section 1155.2, subdivision (b), had expired and no extension had been granted under that section. (*Montebello Rose*, *supra*, at pp. 23–24.) We disagreed with the employer's argument and concluded that, for the reasons set forth in the Board's decision in *Kaplan's*, *supra*, 3 ALRB No. 28, an employer's duty to bargain continues beyond the initial certification year. (*Montebello Rose*, *supra*, at pp. 29–30.)

Our conclusion in the *Montebello Rose* case was based on two principal grounds. The first was that analogous NLRA precedent had held that after the initial certification year expired, there was a rebuttable presumption that a certified union continued to enjoy majority support. (*Montebello Rose*, *supra*, 119 Cal.App.3d at p. 24.) Since no section of the ALRA negated this rule, the presumption of a union's continuing majority status was held applicable to the ALRA. (*Montebello Rose*, *supra*, at p. 24; see § 1148 [the

---

**24** Section 1155.2, subdivision (b) provides: "Upon the filing by any person of a petition not earlier than the 90th day nor later than the 60th day preceding the expiration of the 12-month period following initial certification, the board shall determine whether an employer has bargained in good faith with the currently certified labor organization. If the board finds that the employer has not bargained in good faith, it may extend the certification for up to one additional year, effective immediately upon the expiration of the previous 12-month period following initial certification."

Board must follow "applicable" precedents of the NLRA].)  On this point, we agreed

with the Board's analysis in *Kaplan's* that after the one-year period expired, certification

lapsed for the purpose of the election bar, but not for the purpose of the bargaining duty.

(*Montebello Rose Co.*, *supra*, at pp. 24–25.)  Thus, the application of the rebuttable

presumption rule to the ALRA system did not conflict with section 1155.2,

subdivision (b).**25**

The second ground for our holding in *Montebello Rose* was the fact that, as was

recognized in *Kaplan's*, a number of agricultural policy considerations supported the

conclusion that an employer's duty to bargain did not lapse at the end of the certification

year.  Among these policy considerations were the following:  (1) good faith bargaining

takes time to nurture; (2) if the process had to be compressed into one year, time

pressures might lead to unnecessary strikes and other unrest; (3) once the one-year period

lapsed, it would be difficult to hold another election until at least the next peak season,

which would seriously impair the employees' right to be represented by a union; and

(4) it would create an unreasonable burden to require annual or biannual elections

whenever the parties failed to reach an agreement within the initial certification year.

(*Montebello Rose*, *supra*, 119 Cal.App.3d at p. 25.)  As to the latter consideration, we

cited with approval the Board's reasoning in *Kaplan's* that, where the union was still

acting on behalf of the employees, there was "no need to conduct a ritual reaffirmation of

a union's certification where the employees are satisfied with their representative."

(*Montebello Rose*, *supra*, at pp. 25–26.)  A final consideration was that the Legislature

"could not have intended to 'make the process of collective bargaining into a kind of

sporting event in which the parties play against each other and against a clock at the same

---

**25**      We noted further that, in *Kaplan's*, the Board had stated in deciding this issue "'[t]he
balance to be struck is between the employees' right to reject the incumbent union and the need
for stability in the bargaining relationships.  The employer's "right" not to bargain is no part of
the equation.'" (*Montebello Rose*, *supra*, 119 Cal.App.3d at p. 25, quoting from *Kaplan's*,
*supra*, 3 ALRB No. 28, p. 4.)

time, with the employees' right to effective representation as the stakes [citation].'" (*Id.* at p. 26.)

Our holding in *Montebello Rose* gave deference to *Kaplan's* "somewhat strained" interpretation of the ALRA because it appeared to be true to the underlying purpose of the ALRA as a whole: It would promote stability in the agricultural fields through collective bargaining; it would avoid a beat the clock approach to collective bargaining, and it would allow the time necessary for the nurturing of the bargaining process. (*Montebello Rose*, *supra*, 119 Cal.App.3d at p. 29.) We therefore "approve[d] *Kaplan's* on the employer's duty to bargain beyond the initial certification year." (*Id*. at pp. 29–30.)

A second case, *F&P Growers Assn.*, *supra*, 168 Cal.App.3d 667, involved the issue of whether the rebuttable presumption rule may be used by an employer as a basis for refusing to bargain with an originally certified union. In *F&P Growers*, the employer refused to continue bargaining with the originally certified union in that case, the UFW, because allegedly "objective criteria revealed that a majority of employees in the bargaining unit no longer supported the UFW …." (*Id*. at p. 670.) The employer had argued that since the NLRA's rebuttable presumption rule had been found applicable to the ALRA, related NLRA precedents likewise should be adopted—including the rule allowing an employer to refuse to bargain with a certified union if the employer had a good faith belief that the union had lost its majority support. (*F&P Growers*, *supra*, at pp. 672–677.) In its discussion of that issue, the Court of Appeal acknowledged that prior ALRA judicial (and Board) precedent had adopted the NLRA rule that "a year after certification, there is a rebuttable presumption that a union continues to be supported by a majority of employees" (*F&P Growers*, *supra*, at p. 672), but concluded that the loss-of-majority support defense to bargaining with a particular union was clearly *inapplicable* to the ALRA because of important differences between the ALRA and the NLRA. (*F&P Growers*, *supra*, at pp. 674–676.) For example, the NLRA permitted an employer to

30.

bargain with a union that had demonstrated its majority status by means other than an election, but the ALRA only allowed an employer to bargain with a union that had won an election. Moreover, the NLRA permitted employers to petition for an election, but the ALRA did not allow employers to file election petitions regarding the certification or decertification of a union. (*F&P Growers*, *supra*, at pp. 674–678.) As noted in *F&P Growers*, these distinctive provisions of the ALRA indicated the Legislature did not intend for an agricultural employer to participate in deciding whether or not it shall bargain with a particular union, or to have influence over the selection or deselection of a union. Such choices were left solely to the employees, and were removed from the employer. (*F&P Growers*, *supra*, at pp. 677–678.) For these reasons, the Court of Appeal held that employers could not refuse to bargain with a particular union based on a good faith belief in loss-of-majority status, since that would allow employers to do indirectly (i.e., effectively decertify a union) what the Legislature had removed from the employer's purview. (*Id*. at p. 677.)

To recapitulate what we have said thus far, when the Legislature used ALRA certification terminology in the MMC statute (i.e., "a labor organization certified as the exclusive bargaining agent" of the agricultural employees, § 1164, subd. (a)), it did so with an understanding of the nature and import of the certification status as previously judicially construed. That prior judicial construction included the rulings in the *Montebello Rose* case, discussed above, that (1) after the initial one-year period, certification expires for the purpose of the election bar, but continues for the purpose of the employer's duty to bargain and (2) after the initial one-year period, a rebuttable presumption exists that a certified union continues to enjoy majority support by the employees.[26] It also included the clarification given in *F&P Growers* that,

---

[26] We recognize the one-year period may be extended for an additional year in certain circumstances (see § 1155.2, subd. (b)). In the interest of brevity and ease of expression, our

31.

notwithstanding the adoption of the rebuttable presumption rule, the ALRA did not permit an employer to refuse to bargain in good faith with the originally certified union based on a belief that the union had lost its majority status. Since no contrary intention was indicated in the MMC statute, we conclude that the Legislature intended to adopt the same meanings and implications of the certification status (i.e., its nature and duration) as was decided by said prior judicial construction.[27] This conclusion provides us with the basic framework for understanding the statutory certification[28] concept as we proceed to navigate through an analysis of the abandonment issue.

B.    The Duty to Bargain Does Not Prevent
Raising Abandonment Issue at the MMC Stage

As an initial premise for its position, Gerawan contends that the continuing duty to bargain did not prevent it from asserting, as a defense to the MMC process, that UFW abandoned its status as certified bargaining representative of its agricultural employees. We agree with that contention. The decisions in *Montebello Rose* and *F&P Growers* addressed the situation of employers who had refused to continue bargaining and, therefore, those cases are distinguishable. The rule that an employer must continue to bargain in good faith with the originally certified union is not affected or impaired by allowing an employer to raise the issue of abandonment in response to a request to commence the MMC process. That is because, aside from a brief 30-day period of bargaining at the outset (§ 1164, subd. (c)), the MMC process brings an end to voluntary negotiation and mutual consent, which are the hallmarks of bargaining under the ALRA (§ 1155.2, subd. (a) [good faith bargaining does not compel agreement or require either

discussion has sometimes omitted qualifying statements such as "unless extended for an additional year under section 1155.2, subdivision (b)."

[27]    For this reason, we reject Gerawan's contention that after one year, UFW's certification lapsed for all purposes under section 1155.2, subdivision (b).

[28]    For convenience, we sometimes refer to this as the union's representative status.

32.

party to make a concession]), as it shifts to a compulsory legal process whereby a CBA will simply be imposed by the force of law.  Indeed, as the Board expressly recognized in *Kaplan's*, *supra*, 3 ALRB No. 28 at page 7, the rule that certification continued beyond the first year for purposes of the employer's duty to bargain did not "alter[] the statutory protection given to employers" because "[t]heir duty to bargain, no matter how long its duration, does not compel them to agree to a proposal or require them to make a concession."  Thus, as the Board's own precedent reflects, any process by which parties are *compelled* to *agree* to imposed terms—which is the crux of the MMC process—does not fit into the parameters of bargaining under the ALRA.  Accordingly, since the MMC process differs materially from bargaining and is largely a postbargaining process, the employer's continuing duty to bargain is *not* an impediment to our recognition of the employer's ability to raise, at that stage, a defense that the union forfeited its representative status by abandonment.

For the same reasons, the so-called "certified until decertified" rule does not preclude abandonment from being raised at the MMC stage, because that rule has its application to cases within the bargaining context to enforce the employer's continuing duty to bargain.  (See *Montebello Rose*, *supra*, 119 Cal.App.3d at pp. 23–24 ["employer's **duty to bargain** does not lapse after one year but continues until such time as the union is officially decertified as the employee bargaining representative"], boldface added; *F&P Growers*, *supra*, 168 Cal.App.3d 667 at p. 672 ["an employer's **duty to bargain** does not lapse after one year even in the absence of an extension"], boldface added; *Adamek & Dessert, Inc.*, *supra*, 178 Cal.App.3d at p. 983 ["the company has a **duty to bargain** with the union until the union is decertified through a second election"], boldface added.)  Because the principal purpose of that rule is to prevent employers from refusing to bargain with a certified union (*Montebello Rose*, *supra*, at pp. 23–30*; F&P Growers*, *supra*, at pp. 671–677; *Kaplan's*, *supra*, 3 ALRB No. 28, pp. 4–8), the reasons

for the rule or its strict application would seem to be largely absent outside of the bargaining context.

Accordingly, we agree with Gerawan's initial premise that the present case did *not* involve (1) the employer's continuing duty to bargain *or* (2) the corresponding rule that certification continues for purposes of the duty to bargain. Since these considerations did not come into play, it follows that Gerawan was not precluded on either of these grounds from asserting, as a defense to UFW's request to commence the MMC process, that the union had abandoned its representative status. Rather, as will be seen, that door was open.

C.      Legal Support for Abandonment Theory

Keeping in mind the particular procedural and factual context of our discussion, we proceed to discuss whether there is adequate legal justification for allowing an abandonment theory in this case. We conclude that there is.

Preliminarily, we note that the Board has itself accepted the proposition that a union may be found to have abandoned its representative status under the ALRA. In its prior holdings, the Board has stated that such abandonment takes place where the union is either unwilling or unable to continue in its responsibilities to represent the employees. (*Dole Fresh Fruit Co.*, *supra*, 22 ALRB No. 4, pp. 12–13; *Bruce Church, Inc.*, *supra*, 17 ALRB No. 1, p. 13 ["the Board has defined abandonment as a showing that the Union was either unwilling or unable to represent the bargaining unit"].) Thus, at least *in principle*, the Board has recognized that a union may be deemed to have abandoned its certification or representative status. *However*, the Board has also narrowly circumscribed the factual grounds for finding a union's unwillingness or inability to situations involving either (1) an express disclaimer or (2) union defunctness. (*San Joaquin Tomato Growers, Inc.*, *supra*, 37 ALRB No. 5, p. 4; *Dole Fresh Fruit Co.*, *supra*, 22 ALRB No. 4, pp. 12–13; *Bruce Church, Inc.*, *supra*, 17 ALRB No. 1, p. 13.) While, as explained below, we disagree with the Board's rigid limitation on the factual

34.

grounds for abandonment,[29] we note at this juncture that our conclusion allowing an abandonment claim premised on *other* conduct (such as a union's long-term absence) does not adopt an entirely new theory into the ALRA, but merely expands on an already existing one.[30]

The first and most compelling reason for allowing an abandonment claim in the context of this case is that doing so upholds the core legislative purposes of the ALRA, of which the MMC statute is a part. As we have explained above, the present case is not about the employer's continuing duty to bargain *or* the union's certification within the bargaining context. Once those potential concerns are placed to the side, what emerges is that the main statutory purposes of the ALRA are furthered by the decision we reach herein. In contrast, the Board's blanket rule disallowing an abandonment claim in the circumstances of this case would eviscerate important ALRA policy and, therefore, we do not follow it. (*J.R. Norton Co.*, *supra*, 26 Cal.3d at p. 29 [Board's blanket rule regarding make whole remedy erroneous because it "eviscerates important ALRA policy and fundamentally misconstrues the nature of and legislative purpose behind such relief"]; *Harry Carian Sales v. Agricultural Labor Relations Bd.*, *supra*, 39 Cal.3d at p. 223 [statutes "'must be given such interpretation as will promote rather than defeat the general purpose and policy of the law'"].)

A fundamental purpose of the ALRA is to provide for and protect the right of agricultural employees "to full freedom of association, self-organization, and designation of representatives of their own choosing" for the purpose of collective bargaining. (§ 1140.2; see § 1152.) As stated by our Supreme Court, "the NLRA and ALRA purpose

---

**29** See footnote 31, *post*, regarding another of the Board's limitations on the abandonment defense that we reject in the present context.

**30** In addition to the reasons for our decision that are discussed below, we note the Board's insistence that the factual basis for abandonment must be restricted to express disclaimer and institutional defunctness appears, at least in the present MMC context, to be arbitrary.

35.

is not exclusively to promote collective bargaining, but to promote such bargaining by the employees' *freely chosen* representatives." (*J.R. Norton Co.*, *supra*, 26 Cal.3d at p. 34; see *N.L.R.B. v. Mid-States Metal Products, Inc*. (5th Cir. 1968) 403 F.2d 702, 704 [NLRA is primarily a grant of rights to *employees* rather than a grant of power to unions].)

It is clear that the employees' right to a representative of their own choosing would be seriously jeopardized in the situation of abandonment by a union where, as here, the absentee union suddenly reappeared on the scene to demand the MMC process. A union that has had little or no contact with the employees or the employer over many years (here, decades) would be unlikely to have an adequate working knowledge of the employees' situation or their wishes. From the employees' standpoint, that union would be reappearing on the scene as something of a stranger. Most importantly, during the union's long absence, the employees' working conditions, wages and attitude toward the union (if they even knew they had a union) may have significantly changed over the years. Indeed, it may be the case that the employees do not want to be represented by that union or any other union, which Gerawan asserts was the situation here. Against that potential backdrop is the prospect that, in the MMC process, a CBA will be imposed whether the employees want it or not; and it will be imposed with the formerly absent union, whether the employees want its representation or not. For these reasons, as the present case illustrates, where a union has arguably abandoned the employees but later returns to invoke the MMC process, that situation may create a crisis of representation. Accordingly, it is appropriate to allow the employer to raise the abandonment issue at that stage, because only that result will preserve the ALRA's purpose of protecting the employees' right to choose.[31]

---

[31] In light of the consequences at stake when an MMC request is made, and the need to protect the employees' right to a representative of their own choice, we find the Board's blanket rule that as long as the reappearing union is able and willing to resume its representation of

The usual answer that the employees could mount a decertification effort against the returning union is not adequate in the circumstances under consideration. First, because of the union's absence from the scene, the employees would be at a disadvantage, since they would have no time-tested relationship with the union from which to base a decision on whether or not to seek decertification. Second, in light of the rapid time frame in which an absentee union may return to the scene and invoke the MMC process (see § 1164, subd. (a) [90 days after renewed demand to bargain]), it is reasonably likely that the MMC process would be commenced long before the employees would be able to disseminate adequate information, organize a decertification drive, petition for and hold an election, and obtain the Board's certification thereof. Realistically, a decertification option would often be too late to stop the MMC process.

We add that if the Board were unable to consider an employer's claim of union abandonment when deciding on whether to grant a union's request to commence the MMC process, many of the strong policy considerations enumerated in *Montebello Rose*, *supra*, 119 Cal.App.3d, which were found to be "true to the underlying purpose of the [ALRA] as a whole … to promote stability in the agricultural fields through collective bargaining" (*id.* at p. 29), would be undermined or compromised. Instead of promoting the policy that nurturing the bargaining process requires (in addition to good faith effort) the passage of considerable time (*ibid.*), the Board would have to disregard a union's longtime abandonment of the bargaining relationship. Instead of avoiding a destabilizing, beat-the-clock approach to bargaining (*id.* at pp. 25, 29), the Board would be forced to reward that approach by sending the parties to the MMC process once the

_____

employees at the time of the MMC request, any past abandonment (no matter how egregious) is irrelevant (see, e.g., *Dole Fresh Fruit Co.*, *supra*, 22 ALRB No. 4, p. 12), to be wholly arbitrary and untenable. For the reasons stated, a union's mere reappearance coupled with an MMC request cannot undo the negative effect of its long-term absence or disappearance, but in fact may exacerbate the problems created thereby; and, in any event, the Board's blanket rule cannot be reasonably justified in this context.

37.

90-day period of section 1164, subdivision (a), expired, even if the union had only recently returned from a long-term absence and made no serious economic proposals. Finally, instead of there being an ongoing union relationship with the employees within which a "ritual reaffirmance" of the union's certification status would be unnecessary since it could be safely assumed "the employees are satisfied with their representative" (*Montebello Rose*, *supra*, at pp. 25–26), at the moment of the MMC request by a formerly absent union, that objective basis for presuming the existence of employee support for the union would not be there. These policy objectives, and the negative effect on them if we were to adopt a different result, further demonstrate the soundness of our conclusion that the employer may raise abandonment defensively in response to an MMC request before the Board.

A second reason for recognizing an abandonment claim in the present case is the impact of the rebuttable presumption rule. As we have noted above, *Montebello Rose* found a rebuttable presumption exists that a union continues to enjoy majority status after its initial certification year. (*Montebello Rose*, *supra*, 119 Cal.App.3d at p. 24; see *F&P Growers*, *supra*, 168 Cal.App.3d at p. 672.) The adoption of a rebuttable presumption rule in the ALRA statutory scheme implies that there may be some circumstances, however rare or exceptional, in which an employer may be permitted to show the union has lost its representative status. We believe that such an occasion existed here, where Gerawan sought to oppose the MMC request by showing UFW forfeited its representative status through abandonment. Although *F&P Growers* held an employer could not refuse to bargain with a particular union based on a good faith belief that the union lost its majority support, that holding related to the continuing duty to bargain and did not address situations or proceedings outside the ordinary bargaining context such as the MMC process. We believe there is a meaningful distinction between an employer who affirmatively refuses to bargain with a union, and an employer who is willing to bargain in good faith but who seeks to defend itself against a union's apparently

unwarranted demand to commence the MMC process. In the latter case, we hold the union's representative status may be challenged by the employer.

We understand that showing abandonment of a union's representative status and overcoming the presumption of majority support are not precisely the same things. Although the two concepts substantially overlap in cases such as this one, they are not identical: Abandonment focuses on the union's conduct, while overcoming the presumption focuses on the employees' support (or lack thereof) for the union. But the two concepts are closely related in the present case, because abandonment of the sort that arguably occurred here would tend to support an inference of a lack of majority support. (See, e.g., *Dole Fresh Fruit Co.*, *supra*, 22 ALRB No. 4 at pp. 13–16 [noting that in NLRA, abandonment is a factor in determining whether union lacked majority support]; cf. *N.L.R.B. v. Flex Plastics, Inc.* (6th Cir. 1984) 726 F.2d 272, 275 [union inactivity as to employees a factor in lack of majority support defense, but all the circumstances must be considered]; *Pennex Alum. Corp.* (1988) 288 NLRB 439, 442 [same].) Thus, the same evidence might be introduced in support of either or both theories. Moreover, both concepts are analogous because they share the same function or purpose of challenging the union's status as bargaining representative. In light of the commonalities of the two theories, we hold that the impact of the rebuttable presumption rule (in the MMC context here) was that it opened the door to asserting either or both of them. That is, since the employer could have sought to overcome the presumption in that setting, it likewise was free to assert abandonment there.

Finally, without discounting the unique aspects of labor law under the ALRA, we note that our conclusion is consistent with general principles of law applied in analogous situations. It is not unusual for courts to look to comparable legal concepts for guidance, especially in resolving difficult issues. (See, e.g., *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 472–473, 476 [analogizing union's exclusive bargaining agent status to state-granted franchise].) As pointed out by Gerawan, since a

39.

union's status as exclusive bargaining representative is analogous to other public grants of a monopolistic power or franchise, it is reasonable to suppose that its status may similarly be subject to being lost by abandonment. (See, e.g., *Tehama v. Pacific Gas & Elec. Co.* (1939) 33 Cal.App.2d 465, 471 [a franchise may be lost by subsequent abandonment]; *County of L.A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 384 [privilege of a public franchise lasts only so long as holder meets the obligations in consideration of which the right was granted]; *County of Kern v. Pacific Gas & Electric Co.* (1980) 108 Cal.App.3d 418, 423 [a franchise may terminate on failure to provide services in consideration of which the right was granted]; *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.*, *supra*, at pp. 472–473, 476 [state-granted utilities franchise analogous to a union's monopolistic power].) Additionally, we observe there is an established principle in the common law that rights may be forfeited by abandonment or waiver. (See, e.g., *Gerhard v. Stephens* (1968) 68 Cal.2d 864, 890 [easement rights may be lost by abandonment]; *Lohn v. Fletcher Oil Co., Inc.* (1940) 38 Cal.App.2d 26, 30 [abandonment of contract rights implied from acts of parties]; cf. 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, §§ 16–19, pp. 302–308 [defense of laches applicable to certain claims where there has been prejudicial delay].) While we do not directly rely on these analogous legal theories in reaching our conclusion that an employer may raise union abandonment in defense of the MMC process, we believe they provide additional substantiation of that outcome by showing the broad legal acceptance for the abandonment concept, including in the comparable situation of a publically granted franchise.

D.    Conclusion Regarding Abandonment

In accordance with the forgoing, we hold that an employer, in defending against a union's request to institute the MMC process, may challenge the union's status as the employees' bargaining representative by raising a claim of abandonment based on the union's conduct, such as long-term absence or disappearance from the scene, long-term

failure to carry out its duties, and/or lack of meaningful contact with the employees and the employer over an unreasonably long period of time.**32** The gist of the defense is that by virtue of such longstanding absence, lack of contact, etc., the union has effectively abdicated its statutory role by gross abandonment thereof. As we have stated throughout this opinion, we have reached this holding within the peculiar context of this case— namely, the employer's ability to defend a union's MMC request. Our opinion is intended to be limited to that context.

As our ruling makes clear, the Board applied the wrong legal standard when it held that abandonment could not be based upon factors such as those present in this case. Further, because the Board summarily rejected the viability of Gerawan's abandonment claim, it never adequately considered the import of Gerawan's evidentiary showing on that issue. It follows that the Board abused its discretion when it ordered commencement of the MMC process without properly considering Gerawan's claim of union abandonment. Since the Board improperly sent the parties to commence the MMC process, the Board's subsequent order premised thereon in *Gerawan Farming, Inc.*, *supra*, 39 ALRB No. 17 (to approve the mediator's report) is rendered invalid.

Generally speaking, when the Board applies the wrong standard, we return the case to the Board so that it can apply the proper standard. (*J.R. Norton Co.*, *supra*, 26 Cal.3d at pp. 38–39.)**33** "'It is a guiding principle of administrative law … that "an

---

**32** We note the Board has suggested in its holdings that abandonment might conceivably be found in exceptional circumstances where a union was "'totally absent from the scene'" (*Dole Fresh Fruit Co*., *supra*, 22 ALRB No. 4, p. 18) or "effectively left the scene altogether" (*Bruce Church, Inc.*, *supra*, 17 ALRB No. 1, p. 13). The Board has also stated that it has "an obligation to … be alert to situations in which the certified labor organization rests on its bargaining rights, as such neglect serves to erode and undermine the right to be represented that is granted to employees." (*Dole Fresh Fruit Co*., *supra*, p. 24.)

**33** Even if it might be proper (hypothetically) to decide the issue of abandonment as a matter of law on appeal, we would decline to do so in this case because (1) it does not appear that all the relevant facts were presented by both sides, (2) it is unclear whether the facts are undisputed, and (3) remand is preferable because the Board is the tribunal vested with the discretion to make such determinations in the first instance in ALRA statutory proceedings.

administrative determination in which is embedded a legal question open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy committed to its charge." [Citations.]'" (*J.R. Norton Co.*, *supra*, at p. 39.)

If we followed this general rule here, we would remand the present matter to the Board for new proceedings to be conducted on the issue of abandonment in accordance with the principles set forth herein, to allow the Board to determine, based on the totality of the union's conduct and any other relevant circumstances, the question of whether UFW abandoned its status as the employees' bargaining representative. Here, however, remand is not available because, as discussed below, the MMC statute is constitutionally invalid. As a result, the appropriate disposition concerning the Board's statutory error and abuse of discretion is to simply set aside and reverse the Board's approval of the mediator's report in *Gerawan Farming, Inc.*, *supra*, 39 ALRB No. 17.

THE CONSTITUTIONAL ISSUES

Gerawan raises several constitutional challenges to the MMC statute, including that the law is invalid under the protections afforded to the liberty of contract by substantive due process, fails to comply with equal protection principles, unlawfully delegates legislative powers, violates procedural due process, and constitutes a taking of private property without just compensation. As explained below, we conclude the MMC statute violates equal protection of the law and improperly delegates legislative authority. Since we hold the MMC statute is constitutionally deficient on these two grounds, we find it unnecessary to address the several additional arguments made by Gerawan that the MMC statute is unconstitutional. (See *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230 [courts refrain from rendering unnecessary constitutional law decisions].)

42.

## V.   Equal Protection of the Laws

Gerawan attacks the validity of the MMC statute on the ground that it violates the constitutional requirement of equal protection of the laws.

The equal protection clause of the Fourteenth Amendment to the United States Constitution provides:  "No State shall … deny to any person within its jurisdiction the equal protection of the laws."  (U.S. Const., 14th Amend., § 1.)  The California Constitution expressly provides the same guarantee.  (Cal. Const., art. I, § 7, subd. (a).)  In essence, equal protection of the law means that all persons who are similarly situated with respect to a law should be treated alike under the law.  (*Cleburne v. Cleburne Living Center, Inc*. (1985) 473 U.S. 432, 439; *Arcadia Development Co. v. City of Morgan Hill* (2011) 197 Cal.App.4th 1526, 1534.)  "Of course, most laws differentiate in some fashion between classes of persons.  The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.  [Citation.]"  (*Nordlinger v. Hahn* (1992) 505 U.S. 1, 10.)

"The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.  [Citations.]  When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, [citations], and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."  (*Cleburne v. Cleburne Living Center, Inc.*, *supra*, 473 U.S. at p. 440; accord, *FCC v. Beach Communications, Inc*. (1993) 508 U.S. 307, 313–314.)

As Justice Robert Jackson explained many years ago:  "[C]ities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants *except upon some reasonable differentiation fairly related to the object of regulation.  This equality is not merely abstract justice.  The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law

43.

which officials would impose upon a minority must be imposed generally.  Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected.  Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation." (*Railway Express v. New York* (1949) 336 U.S. 106, 112–113, italics added (conc. opn. Jackson, J.), cited with approval in *Hays v. Wood* (1979) 25 Cal.3d 772, 786–787.)

The same rational basis standard is applied for purposes of the equal protection provision of the California Constitution.  (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481–482*; County of L.A. v. Southern Cal. Tel. Co*., *supra*, 32 Cal.2d at pp. 389–390.)  This deferential standard "'invests legislation involving such differentiated treatment with a presumption of constitutionality and "requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose." [Citation.]'" (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641.)  "Past decisions also establish that, under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative." (*Id*. at p. 644, citing *Williamson v. Lee Optical Co*. (1955) 348 U.S. 483, 489 ["Evils in the same field may be of different dimensions and proportions, requiring different remedies.  Or so the legislature may think.  [Citation.]  Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."].)

A key principle that must be applied in the present analysis is that "[a]n administrative order, legislative in character, is subject to the same tests as to validity as an act of the Legislature.  [Citations.]" (*Knudsen Creamery Co. v. Brock* (1951) 37

Cal.2d 485, 494 (*Knudsen Creamery Co.*).) As the majority opinion in *Hess* correctly observed, the action of the Board in approving a final CBA submitted by the mediator is essentially *legislative* in character: "There can be no doubt that the compulsory interest arbitration scheme provides for quasi-legislative action. Although the statutes refer to the end result as a 'collective bargaining agreement,' there is no agreement. In this case Hess not only did not agree to be bound by the terms of employment imposed by the mediator, it did not agree to submit to interest arbitration at all. The terms of the 'agreement' determined by the arbitrator were imposed upon Hess by force of law. [¶] The statutory scheme is not quasi-judicial. An administrative action is quasi-judicial, or quasi-adjudicative, when it consists of applying existing rules to existing facts. [Citation.] The creation of new rules for future application, such as is done here, is quasi-legislative in character. [Citation.] This is so even though the action is, as here, taken in an individual case. [Citation.]" (*Hess, supra,* 140 Cal.App.4th at pp. 1597–1598.) Accordingly, when under the MMC statute the Board approves or adopts a mediator's report (such as the one in this case regarding Gerawan) and thereby establishes an enforceable CBA as to a particular employer and union, the resulting CBA is legislative or regulatory in character and is "subject to the same tests as to validity as an act of the Legislature" (*Knudsen Creamery Co., supra,* at p. 494), including the test of constitutionality under the equal protection clause.

Here, in attacking the MMC statute on equal protection grounds, Gerawan makes essentially the same argument that Justice Nicholson made in his dissenting opinion in *Hess*. In Justice Nicholson's dissent, he gave the following explanation of why he believed the MMC statute violated equal protection principles:

"I assume, for the sake of argument, that treatment of an agricultural employer that does not reach agreement with the union on an initial collective bargaining agreement can be different from the treatment of an agricultural employer that reaches an agreement with the union on an initial collective bargaining agreement because of the state's interest

45.

in promoting collective bargaining agreements. Here, however, the disparate treatment is not just between employers with initial collective bargaining agreements and employers without such agreements. Application of … section 1164 and the related statutes results in disparate treatment *within* the class of employers without an initial collective bargaining agreement because the agreement imposed on each employer in this class will be different. While the legitimate state interest that I assume for argument exists may justify disparate treatment between classes, it cannot justify disparate treatment within the class. (*Cleburne v. Cleburne Living Center*, [*Inc*.,] *supra*, 473 U.S. at p. 439.)

"[S]ection 1164 sets forth the classification at issue in this case: agricultural employers who, for whatever reason, do not agree to the terms of an initial [CBA]. Within this class, the law does not treat the individual employers similarly. Instead, each employer will be subjected to a different legislative act, in the form of a [CBA]. Thus, similarly situated employers are treated dissimilarly.

"Beyond the classification set by … section 1164, there is no rational way to break the agricultural employers down into smaller groups. The statute makes no such attempt, except, of course, to break it down so that every agricultural employer is the one and only member of the class. *This means of classification, however, is the very antithesis of equal protection.* While the Legislature may have intended this as a way to avoid the political retribution it might incur if it enacted laws applicable equally across the class, that motivation is entirely insufficient to justify the disparate treatment. (See *Hays v. Wood*, *supra*, 25 Cal.3d at pp. 786–787.)

"'"'"[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'"' [Citations.]' (*Village of Willowbrook v. Olech* (2000) 528 U.S. 562, 564.) Here, the discrimination—that is, holding Hess, and no other agricultural employer, to the terms of a private legislator's decision—is intentional

because the mediator has no power to extend the enactment to other agricultural employers. The mediator could have had no intent other than to impose a [CBA] enforceable only as to Hess and no other agricultural employer. Furthermore, the discrimination is arbitrary because there are no standards set forth pursuant to which the mediator's decision in this case will be the same as a mediator's decision in any other case under … section 1164 and the related statutes. Enforcement of the mediator's decision violates equal protection principles and, therefore, should be set aside." (*Hess*, *supra*, 140 Cal.App.4th at pp. 1615–1617, italics added (dis. opn. of Nicholson, J.).)

Gerawan urges us to adopt Justice Nicholson's reasoning. To further make its point, Gerawan focuses on one single aspect of any CBA that is imposed on an employer pursuant to the MMC process—namely, wages. In this regard, Gerawan argues as follows: "The State has the right to establish a minimum wage for *all* employers or for *all* employers in a particular industry. But the State cannot constitutionally set different minimum wages for different companies [in the same industry] without a rational reason for doing so. Because the MMC Statute by design … sets different minimum wages for different companies [in the same industry], it must be struck down as unconstitutional. [¶] Indeed, the whole point of the MMC Statute is to single out one employer and create a special set of rules for that employer alone."

We think the force of Gerawan's argument is magnified when it is considered that a CBA is not a limited document confined to wages only, but it covers a wide array of various rights, duties and relationships: "The [CBA] states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The [CBA] covers the whole employment relationship." (*Inlandboatmens Union of Pacific v. Dutra Group* (9th Cir. 2002) 279 F.3d 1075, 1079, quoting *Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 578–579.) Since a CBA is a diverse set of rules covering the whole employment relationship, *that* is the nature of what is being imposed in each case under the MMC process.

The response given by the *Hess* majority opinion (*Hess*, *supra*, 140 Cal.App.4th at p. 1604), and argued now by the Board and UFW, is that the factors set forth in section 1164, subdivision (e), ensure that similarly situated employers will be treated alike. Section 1164, subdivision (e) states: "In resolving the issues in dispute, the mediator may[34] consider those factors commonly considered in similar proceedings, including: (1) The stipulations of the parties. [¶] (2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer claims an inability to meet the union's wage and benefit demands. [¶] (3) The corresponding wages, benefits, and terms and conditions of employment in other [CBA's] covering similar agricultural operations with similar labor requirements. [¶] (4) The corresponding wages, benefits, and terms and conditions of employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed. [¶] (5) The average consumer prices for goods and services according to the California Consumer Price Index, and the overall cost of living, in the area where the work is performed." According to the *Hess* majority opinion, "[t]hese requirements reasonably ensure that contracts of different employers will be similar" and, therefore, no equal protection violation was found. (*Hess*, *supra*, at p. 1604.)

We fail to see how the statutory factors listed in subdivision (e) of section 1164 cure the fundamental equal protection violation pointed out by Justice Nicholson in *Hess*. The requirement that every mediator conducting the MMC process shall consider this list of factors in making his or her various decisions as to the multiple terms and conditions of a particular CBA to be imposed on an individual employer does not even come close

---

**34** To prevent the required criteria from being rendered "illusory," the Court of Appeal in *Hess* construed the word "'may'" as meaning "'must.'" (*Hess*, *supra*, 140 Cal.App.4th at p. 1607.)

to ensuring that similarly situated employers will receive the same or similar results under the law. It only means that such factors will in fact be considered and that the particular determinations of the mediator must have some minimal support in the record. (§ 1164, subds. (d), (e).) Inevitably, each imposed CBA will still be its own set of rules applicable to one employer, but not to others, in the same legislative classification concerning such matters as wages, benefits, working conditions, hiring, disciplinary and termination procedures, union dues, union membership requirements, duration of the CBA, and other terms and conditions of employment and/or of the employer-union relationship. Thus, the necessary outworking of the MMC statute is that each individual employer (within the class of agricultural employers who have not entered a first contract) will have a distinct, unequal, individualized set of rules imposed on it.[35] This is, as Justice Nicholson succinctly put it, "the very antithesis of equal protection." (*Hess*, *supra*, 140 Cal.App.4th at p. 1616.)[36]

Additionally, the results would not only be unequal, but also arbitrary. Because of the differences of each employer and the subjectivity of a process whereby the only objective standard or goal to be met in the MMC statute is *to resolve issues* so that a first contract may be imposed (see § 1164, subd. (d)), it would appear to be unavoidable that even similar employers will be subject to significantly different outcomes. [37] Since the

---

[35] Although the *process* might be roughly the same in each case, we keep in mind that the administrative result ordered by the Board in each case (i.e., *each CBA*) would have to be considered for equal protection purposes.

[36] We distinguish the situation in which a local municipality (i.e., a city or a county) requires by ordinance that compulsory interest arbitration be used to resolve an impasse with certain public employees such as firefighters or police officers (or with the unions representing them), since in those cases there is essentially only one employer.

[37] This is illustrated by the following scenarios.

In Case A, an employer and a union cannot agree to the terms of a CBA and the matter undergoes the MMC process before Mediator X. The mediator receives evidence that employer currently pays wages that are *slightly below the industry average* in the same geographic area, and that employer consistently earns *profits at the high end of the industry range*. Mediator X

49.

factors in subdivision (e) of section 1164 are broad and varied enough to permit a mediator to select from among a wide range of potential CBA terms that he or she may think best (as long as minimal support for the decision is provided), the risk is simply too great that results will be based largely on the subjective leanings of each mediator or that arbitrary differences will otherwise be imposed on similar employers in the same classification—particularly as there is no objective standard toward which the mediator is required to aim.**38**

In so holding, we disagree with the Board and UFW that the MMC statute is analogous to a rent control ordinance where one apartment building in a municipality may be granted a right to charge a higher rent than another (i.e., different results would be acceptable as long as they were rationally based). In the case of a rent control ordinance, a local board or commission attempts to determine a rent ceiling or a rent adjustment based upon an administrative standard (such as a "'fair and reasonable return on investment'") by using a specified formula or a list of factors. (*Fisher v. City of*

---

then drafts a CBA, which includes a wage increase requiring employer to pay *wages greater than the industry average* and which, in turn, *reduces employer's profits to the local industry average.*

In Case B, Mediator Y receives evidence that is substantially identical to that in Case A. Mediator Y then drafts a CBA, which includes a *slight wage increase to bring wages to the industry average*, which, in turn, *reduces employer's profits* but its profits remain above the local industry average.

In Case C, Mediator Z receives evidence that is substantially identical to that in Cases A and B. Mediator Z then drafts a CBA, which makes *no change to the existing wages* being paid. Accordingly, the CBA's wage term has *no effect on the Employer's profits.*

Since there is no standard as to whether wages are to be paid or profits earned at an industry average or within a certain industry range, the CBA's issued by Mediators X, Y and Z are each supportable by the evidence received. Yet, each CBA contains different terms based on the same evidence and results in different wages and a different impact on the profit margin for each employer.

**38** The instant case is an example of this very problem. The record showed that Gerawan paid its employees the highest average wages among its closest competitors; yet, the mediator elected to impose a wage increase in any event. The decision was justified by weighing and considering a wide variety of factors.

*Berkeley* (1984) 37 Cal.3d 644, 679–681; *Kavanau v. Santa Monica Rent Control Bd*. (1997) 16 Cal.4th 761, 768–769.)  Here, in contrast, there is a broad range of factors but no standard.  Moreover, we believe the inequality and arbitrariness of the MMC process are on a far grander scale than might occur under an inadequately worded rent control law because, unlike the case of rent control (which only decides on a single term of a broader contractual relationship), here the Board, through the mediator, establishes the *entire* CBA.

For all of the above reasons, we agree with Justice Nicholson's dissent in *Hess* that the MMC statute on its face violates equal protection principles.

## VI.     Improper Delegation of Legislative Authority

Gerawan argues that the MMC statute invalidly delegates legislative authority in violation of the California Constitution.

An unconstitutional delegation of authority occurs when a legislative body "(1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy."  (*Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 190.)  "'This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues.  It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions.'  [Citation.]  [¶]  The doctrine prohibiting delegations of legislative power does not invalidate reasonable grants of power to an administrative agency, when suitable safeguards are established to guide the power's use and to protect against misuse. [Citations.]  The Legislature must make the fundamental policy determinations, but after declaring the legislative goals and establishing a yardstick guiding the administrator, it may authorize the administrator to adopt rules and regulations to promote the purposes of the legislation and to carry it into effect.  [Citations.]  Moreover, standards for administrative application of a statute need not be expressly set forth; they may be

51.

implied by the statutory purpose. [Citations.]" (*People v. Wright* (1982) 30 Cal.3d 705, 712–713.)

In *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, the California Supreme Court held that the rent control scheme at issue in that case gave adequate guidance in its delegation of authority to the rent control board because, in addition to providing a nonexclusive list of relevant factors to be considered by the board in determining adjustment of maximum rents, the stated purpose of the charter amendment furnished an implied standard for the board to apply. (*Id.* at p. 168.) "[T]he charter amendment's purpose of counteracting the ill effects of 'rapidly rising and exorbitant rents exploiting [the housing] shortage' [citation] implies a standard of fixing maximum rent levels at a point that permits the landlord to charge a just and reasonable rent and no more." (*Ibid.*)

Applying the above principles, we agree with Gerawan that the MMC statute improperly delegated legislative authority. Although the MMC statute enumerates several factors for the mediator to consider when making his or her various decisions about the terms of what will become a compelled CBA (§ 1164, subd. (e)), it does not provide the mediator with any policy objective to be carried out or standard to be attained once those factors have been considered. Since there is no goal to aim for, no one would ever know if the mediator hit the correct target or even came close. As was observed by Justice Nicholson in his dissent in *Hess*: "Even though under the statute at issue the mediator must make factual findings and those findings must be supported by the record, there is no way to determine whether the facts found by the mediator support the decision unless one knows what basic public policy the mediator must vindicate." (*Hess*, *supra*, 140 Cal.App.4th at p. 1612.)

Additionally, unlike the *Birkenfeld* case, the legislative purpose of the MMC statute fails to supply the necessary guidance to either the mediator or the Board. The stated purpose of the MMC statute is to "ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more

52.

fully attain the purposes of the [ALRA], ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural labor force, and promote California's economic well-being by ensuring stability in its most vital industry." (Stats. 2002, ch. 1145, § 1.) Justice Nicholson is correct that "[t]his pronouncement [is] so general it fail[s] to provide any actual guidance." (*Hess*, *supra*, at p. 1612.) In short, no implied standard is discernable in the MMC statute.

For this reason, the difference between the present case and *Birkenfeld* is substantial. In *Birkenfeld*, because there was an implied standard that the rent control board was to implement—a just and reasonable rental amount based on several factors— the rent control board had sufficient direction and guidance regarding the responsibility delegated to it. (*Birkenfeld*, *supra*, 17 Cal.3d at p. 168–169.) In other words, there was a particular destination the rent control board was supposed to reach, and a reasonable roadmap for getting there. In theory, at least, all of the information gathered in the rent control proceeding could be weighed and considered in making the ultimate determination of a just and reasonable rental amount and, once so determined, the amount of rent that could permissibly be charged was thereby established. In contrast under the MMC statute, there is no particular destination that is supposed to be reached by the mediator, no particular determination that is to be made, and nor is any direction given as to the mediator's task or purpose other than to impose a CBA on the parties after considering the listed factors.

We may further illustrate the lack of adequate standards under the MMC statute by posing a few questions with no discernable answers. Other than to create and impose an agreement, what is the mediator's precise purpose, goal or aim under the MMC statute? Is it to raise workers' wages? Is it to improve working conditions? Is it to impose on the grower any and all union demands the mediator deems *reasonable* and which the mediator believes the grower can *afford* and, if so, how are *reasonable* and *afford* defined? Is it to ensure that wages paid are at least industry average for comparable

53.

work?  Is the mediator's starting point to determine a *minimum*, fair profit margin for the grower and then to determine in what amount the workers are to be compensated without compromising that margin; or is it to first determine a *minimum* amount the workers are to be compensated without regard to grower profit margins?  By posing these questions, we are not saying that any of our questions embody wise or legitimate statutory objectives.  We are simply pointing out that we cannot tell what the mediator's task is supposed to be under the MMC statute, and these questions serve to highlight a number of hypothetical possibilities without in any way approving of them.  The bottom line is this:  In the MMC statute, the Legislature has delegated broad legislative authority to the mediator and the Board under the MMC process, but has not provided adequate standards to guide and direct the use of that delegated authority or prevent its misuse.

Finally, the delegation of powers under the MMC statute also lacks the necessary procedural safeguards or mechanisms to assure a fair and evenhanded implementation of the legislative mandate to impose a CBA.  *Birkenfeld* held that even if there is "legislative guidance by way of policy and primary standards," it is not enough if the Legislature fails to establish safeguards or mechanisms to protect against unfairness or favoritism. (*Birkenfeld*, *supra*, 17 Cal.3d at p. 169.)  Here, in addition to the lack of standards, we do not see how the highly deferential and limited review the Board undertakes of a mediator's report under the MMC statute could be deemed a realistic safeguard against unfairness or favoritism.  For the most part, the Board *must* approve the mediator's report as the final order of the Board unless a challenged CBA provision is either (i) "unrelated to wages, hours or other conditions of employment," (ii) "based on clearly erroneous findings of material fact," or (iii) "arbitrary and capricious" in light of the mediator's findings of fact.  (§ 1164.3, subd. (a).)  In practical effect, this means the Board must give virtually a rubber-stamp approval to the mediator's reported CBA as long as the terms thereof have at least a small kernel of plausible support, are not wholly arbitrary, and the mediator has considered the factors listed in section 1164, subdivision (e).  Except in

54.

perhaps the most egregious instances of overreaching, the Board's hands would be tied and the report would have to be approved. In light of the mediator's considerable range of power to determine all aspects of a compelled CBA, which would include a broad array of important economic terms and relationships, such a highly deferential and narrow review mechanism would not be able to meaningfully protect the parties against favoritism or unfairness in regard to the determination of the CBA's terms.

Potentially compounding the problem further is the fact that a mediator's report to the Board may not necessarily provide a complete or adequate record of the rationale for the mediator's various decisions concerning the terms of the CBA. During the voluntary mediation phase of the MMC process, the mediator may have received ex parte or confidential communications, and may have been decisively influenced by what was said to him during that private phase of the proceedings. Although we do not say that merely having the same mediator conduct the voluntary mediation phase *and* the involuntary binding interest arbitration phase is a violation of due process, we do believe it is another factor that may hinder the effectiveness of the review mechanism provided in the MMC statute. Information divulged in the voluntary mediation phase would not likely make its way into the report or otherwise come to the Board's attention, nor would it likely become part of the record brought before the Court of Appeal when judicial review of the Board's decision is requested under section 1164.5. For all of the above reasons, we conclude that in its delegation of legislative authority to the mediator and the Board, the MMC statute did *not* provide an adequate procedural mechanism to protect the parties from favoritism or unfairness in the MMC process.

In summary, the MMC statute grants to the mediator and the Board the power to establish employment terms that will be imposed by the force of law (i.e., to legislate) with regard to a particular employer (i.e., create and compel an entire CBA) without any definite policy direction, goal or standard that is supposed to be reached or implemented. The law presents factors, but factors alone are not enough. Additionally, there are no

55.

adequate mechanisms or safeguards in place under the MMC statute to protect against favoritism in the use of such delegated power. We conclude the MMC statute involves an unconstitutional delegation of legislative authority, because it leaves the resolution of fundamental policy issues to others and it fails to provide adequate direction and safeguards for the implementation of that policy.

THE CONSOLIDATED CASE (CASE NO. F068676)

## VII. Denial of Writ Relief Affirmed on Narrow Grounds

After the Board initially ordered Gerawan and UFW to commence the MMC process, Gerawan filed a petition for writ of mandate in the superior court challenging the validity of the Board's order. In that petition to the trial court, and in the points and authorities filed in support of said petition, Gerawan raised the same statutory issues and many of the same constitutional issues that were presented in the instant petition for review to this court, which we have granted (i.e., case No. F068526, decided above). The particular statutory issues raised by Gerawan in the trial court petition for writ of mandate were that the Board erroneously construed the criteria of sections 1164 and 1164.11 and wrongly concluded that such criteria were satisfied in this case, which errors included the Board's improper refusal to allow Gerawan to prove that UFW had abandoned its status as the employees' bargaining representative. The constitutional issues raised in the trial court petition for writ of mandate focused on due process challenges to the MMC statute, including a claim that the MMC statute violates due process because of its use of a single mediator to handle both mediation and arbitration, especially where that person would be privy to ex parte discussions with the parties that are off the record. In seeking a writ of mandate in the trial court, the petition also contended that section 1164.9 did not preclude the trial court from hearing the matter.

The trial court allowed Gerawan's petition for writ of mandate to proceed (rejecting the Board's argument that section 1164.9 precluded it from exercising jurisdiction), but the court ultimately denied the relief sought in Gerawan's petition. The

56.

primary ground for the trial court's denial of relief was that the matter had not reached sufficient administrative finality to warrant writ relief, because the Board's order was merely "the first step in a multi-step process which culminates in a final order from the [Board]. [Citation.]" That being the case, the trial court also found that it would be speculative at that point to conclude that definite harm would result if the court did not issue a writ. The trial court further noted there were administrative and judicial remedies provided, including a provision for judicial review at the end of the administrative process. The trial court did not reach the constitutional due process issue, because it did not appear to be ripe. For these and other reasons, the trial court concluded that the issuance of a writ of mandate was not procedurally necessary or appropriate, especially due to lack of administrative finality, and the petition was denied.**39**

Gerawan appealed from the trial court's denial of the petition for writ of mandate, which we have ordered consolidated with the instant petition for review. Since we have addressed and resolved the statutory issues above (in connection with the petition for review), it is unnecessary to do so again. As to the constitutional issues, we have concluded above that the MMC statute violates equal protection of the law and the prohibition against improper delegation of legislative powers. In light of that ruling, it is unnecessary to address the additional claims of constitutional law defects regarding the MMC statute. (See *Santa Clara County Local Transportation Authority v. Guardino*, *supra*, 11 Cal.4th at p. 230 [courts refrain from rendering unnecessary constitutional law decisions].)

---

**39** In so holding, the trial court further noted that, in any event, there was no abuse of discretion evident, because it appeared to the court that all the statutory criteria necessary for the commencement of the MMC process were satisfied. Although this particular ground for the trial court's ruling (i.e., that the statutory criteria were all satisfied) was incorrect in view of our conclusion above relating to the abandonment issue, as explained below we will affirm the trial court's result (the denial of the writ), even though we do not agree with this ground stated by the trial court.

57.

In addition to the fact that our ruling in the petition for review (above) has rendered the specific relief sought in the petition for writ of mandate unnecessary and largely moot, we note further that it appears Gerawan had an adequate remedy within the context of the administrative process (i.e., the petition for review) in this particular case and, therefore, a clear basis for the trial court's denial of extraordinary relief existed. That is, the same essential statutory and constitutional challenges to the MMC process could have been, and actually were, adequately raised by Gerawan in its petition for review, which we have heard and considered. Hence, in this particular instance at least, Gerawan had an adequate remedy.[40] (Code Civ. Proc., § 1086 [extraordinary writ relief is properly denied where the party has an adequate remedy].) On the narrow ground that an adequate remedy existed, we affirm the denial of the writ petition in the trial court. (*Phelan v. Superior Court* (1950) 35 Cal.2d 363, 366, 370-371 [writ correctly denied where another adequate remedy present].)

## DISPOSITION

The Board's order in *Gerawan Farming, Inc.*, *supra*, 39 ALRB No. 17 (case No. F068526) is reversed and set aside. In light of the above ruling, the trial court's denial of the writ in case No. F068676 is affirmed. Costs are awarded to Gerawan.

_____

KANE, J.

WE CONCUR:

_____

HILL, P.J.

_____

LEVY, J.

---

[40] We do not decide whether, or in what circumstances, a party may be permitted to seek a writ of mandate in the trial court in this context. Thus, we leave unanswered the question of whether section 1164.9 precluded the petition for writ of mandate in the trial court.